**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-2316
_____

RACE TIRES AMERICA, INC., a Division of Specialty
Tires of America, INC.; SPECIALTY TIRES OF AMERICA,
INC; SPECIALTY TIRES OF AMERICA
PENNSYLVANIA, INC.; SPECIALTY TIRES OF
AMERICA TENNESSEE, LLC,

Appellants

v.

HOOSIER RACING TIRE CORP;DIRT MOTOR SPORTS,INC
d/b/a World Racing Group
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil No. 2:07-cv-01294)
District Judge: Hon. Terrence F. McVerry
_____

Argued December 12, 2011

Before: SLOVITER, VANASKIE, *Circuit Judges,* and STENGEL, [*] *District Judge*

(Filed: March 16, 2012)

Joseph Decker, Esq. (Argued)
Mark D. Shepard, Esq.
Mark K. Dausch, Esq.
Babst, Calland, Clements and Zomnir, P.C.
Two Gateway Center, 6th Floor
Pittsburgh, PA 15222

    *Counsel for Appellants*

Donald E. Knebel, Esq.
Kendall Millard, Esq.
Deborah Pollack-Milgate, Esq. (Argued)
Aaron M. Staser, Esq.
Barnes & Thornburg LLP
11 South Meridian Street
Indianapolis, IN 46204

Donna M. Doblick, Esq.
Reed Smith LLP
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222

    *Counsel for Appellee Hoosier Racing Tire Corp. d/b/a*
    *World Racing Group*

---

[*]The Honorable Lawrence F. Stengel, District Judge for the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

Theodore H. Jobes, Esq. (Argued)
Christine Soares, Esq.
Fox Rothschild LLP
2000 Market Street, 20th Floor
Philadelphia, PA 19103

John R. Gotaskie, Jr., Esq.
Fox Rothschild LLP
625 Liberty Ave., 29th Floor
Pittsburgh, PA 15222

*Counsel for Appellee Dirt Motor Sports, Inc.*

_____

OPINION

_____

VANASKIE, *Circuit Judge*.

At issue in this appeal is whether all charges imposed by electronic discovery vendors to assist in the collection, processing, and production of electronically stored information ("ESI") are taxable against a losing party as "[f]ees for exemplification [or] the costs of making copies of any materials where the copies are necessarily obtained for use in the case." 28 U.S.C. § 1920(4). We have not previously addressed this issue, and the courts that have considered this question have reached conflicting results. *Compare, e.g.*, *In re Aspartame Antitrust Litig.*, No. 2:06-CV-1732-LDD, 2011 WL 4793239, at *3 (E.D. Pa. Oct. 5, 2011) ("We . . . award costs for the creation of a litigation database, storage of data, imaging hard drives, keyword searches,

3

deduplication, data extraction and processing."), *with Rawal v. United Air Lines, Inc.*, No. 07 C 5561, 2012 WL 581146, at *2-4 (N.D. Ill. Feb. 22, 2012) (refusing to award electronic processing costs as taxable).

The District Court in this case concluded that more than $365,000 in charges imposed by the electronic discovery vendors, covering such activities as hard drive imaging, data processing, keyword searching, and file format conversion, are taxable, without differentiating between those charges that constitute "[f]ees for exemplification," and the charges that constitute "costs of making copies." § 1920(4). In view of the significant role that electronic discovery plays in litigation today, involving the collection, processing, and production of huge volumes of data generated as a result of the information technology and communication revolutions, we believe it imperative to provide definitive guidance to the district courts in our Circuit on the question of the extent to which electronic discovery expenses are taxable.[1] We conclude that none of

---

[1] In 2004, it was estimated that approximately 95% of all documents were created by electronic means. *See, e.g.*, James M. Evangelista, *Polishing the "Gold Standard" on the e-Discovery Cost-Shifting Analysis:* Zubulake v. UBS Warburg, LLC, 9 J. Tech. L & Pol'y 1, 2 (2004). More importantly, the ease with which ESI is created, distributed, duplicated, and stored has resulted in exponentially greater volumes of data that must be assembled, analyzed, and produced in litigation. *See* The Sedona Conference, *The Sedona Conference Best Practices Commentary on the Use of Search and Information Retrieval Methods in E-Discovery*, 8 Sedona Conf. J. 189, 193 (2007) ("The shift of information storage to a digital realm has . . . caused an explosion in the

4

amount of information that resides in any enterprise[,] profoundly affecting litigation.").  It is estimated that in 2011, 1.8 zettabytes of data were created, the equivalent of 57.5 billion iPads, each with thirty-two gigabytes of storage.  *See* Press Release, EMC Corp., World's Data More than Doubling Every Two Years—Driving Big Data Opportunity, New IT Roles (June 8, 2011), *available at* http://www.emc.com/about/news/press/2011/20110628-01.htm (citing John Gantz & David Reinsel, IDC, *2011 Digital Universe Study: Extracting Value from Chaos* (2011)). The burden and expense thus far associated with discovery of ESI has resulted in changes to the Federal Rules of Civil Procedure and to the adoption of Federal Rule of Evidence 502, the rules governing discovery in a number of states, the adoption of proposed uniform rules by the National Conference of Commissioners on Uniform State Laws, and the promulgation of standards by the American Bar Association.  *See, e.g.*, Fed. R. Civ. P. 34(a) advisory committee's note (2006 amendments) (explaining changes to the Federal Rules of Civil Procedure due to the impact of the exponential growth in recoverable information); Fed. R. Evid. 502 advisory committee's note (explaining the adoption of Federal Rule of Evidence 502 to respond, in part, to the proliferation of electronic information); Dan H. Willoughby et al., *Sanctions for E-Discovery Violations: By the Numbers*, 60 Duke L.J. 789, 791 n.3 (2010) (discussing discovery rule changes in several states due to ESI); Nat'l Conference of Comm'rs on Unif. State Laws, *Uniform Rules Relating to the Discovery of Electronically Stored Information* (2007), *available at* http://www.law.upenn.edu/b11/archives/ulc/udoera/2007 final.pdf; American Bar Association Civil Discovery

the electronic discovery vendors' activities in this case can be regarded as "exemplification" of materials. We further conclude that only scanning and file format conversion can be considered to be "making copies," an activity that amounts to approximately $30,000 of the more than $365,000 in electronic discovery charges taxed in this case. Accordingly, we will affirm in part, vacate in part, and remand the matter to the District Court to reduce the cost award accordingly.

I.

In September of 2007, Appellant Race Tires America, Inc. ("RTA"), a tire supplier, sued Appellees Hoosier Racing Tire Corp. ("Hoosier"), a competitor, and Dirt Motor Sports, Inc. d/b/a World Racing Group ("DMS"), a motorsports sanctioning body. RTA asserted violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, arising out of the adoption of a "single tire rule" for certain motorsports and the related exclusive supply contracts for race tires between Hoosier and a number of sanctioning bodies, including DMS. RTA estimated that damages, before trebling, exceeded $30 million.

---

Standard § 29 cmt. (2004) (discussing the 2004 amendments to the American Bar Association Civil Discovery Standards to facilitate electronic discovery).

As would be expected in a case of this nature and magnitude, the parties engaged in extensive discovery of ESI. The Case Management Order ("CMO"), issued by the District Court in January of 2008, directed the parties to attempt to agree upon a list of keyword search terms, with a party's use of such terms carrying a presumption that it had fulfilled its "obligation to conduct a reasonable search." (A. 79.) The CMO further provided that, unless native file format was "reasonably necessary to enable the other parties to review those files," (A. 80), ESI was to "be produced in 'Tagged Image File Format,'" accompanied by "[a] cross reference or unitization file, in standard format (e.g. Opticon, Summation DII, or the like) showing the Bates number of each page and the appropriate unitization of the documents."[2] (A. 79.) The CMO further identified specific metadata fields that had to be produced if reasonably available.[3] (A. 79-80.) Finally, the

-----

[2] The native file format is the "file structure defined by the original creating application," such as a document created and opened in a word processing application. The Sedona Conference, *The Sedona Conference Glossary: E-Discovery & Digital Information Management* 35 (Sherry B. Harris et al. eds., 3rd ed. 2010). Tagged Image File Format ("TIFF") is "[a] widely used and supported graphic file format[] for storing bit-mapped images, with many different compression formats and resolutions." *Id.* at 50. TIFF "[i]mages are stored in tagged fields, and programs use the tags to accept or ignore fields, depending on the application." *Id.* Unitization is "[t]he assembly of individually scanned pages into documents." *Id.* at 52.

[3] Metadata is "[d]ata typically stored electronically that describes characteristics of ESI, found in different places in different forms." The Sedona Conference, *supra* note 2, at

CMO directed the parties to produce "[a]n extracted text file or searchable version . . . for each electronic document in a document level text file (except for any file produced in native format)."[4] (A. 80.)

Hoosier and DMS each retained separate vendors to assist with the production of ESI.[5] Specifically, DMS

---

34. While "[s]ome metadata, such as file dates and sizes, can easily be seen by users[,] other metadata can be hidden or embedded and unavailable to computer users who are not technically adept." *Id.* For example, in this case, the District Court ordered the parties to produce "metadata fields associated with each electronic document . . . where reasonably available," including, in part, the fields of "BegDoc," "EndDoc," "BegAttach," "EndAttach," "Author," "BCC," "CC," "Company," "Custodian Name," "Date Created," "Date Last Modified," and "Edit Time." (A. 78-79.) Allowing discovery of these metadata fields permitted the parties to seek information that may not have been available in the documents' text.

[4] An extracted text file is a file containing text taken from an original electronic document. *See* The Sedona Conference, *supra* note 2, at 12 (defining "[d]ata [e]xtraction").

[5] Electronic discovery has spawned much more than "[a] cottage industry." *Hopson v. City of Balt.*, 232 F.R.D. 228, 239 n.32 (D. Md. 2005) (quoting T. Delaney, *E-Mail Discovery: The Duties, Danger and Expense*, 46 Fed. Lawyer 42, 44 (Jan. 1999)). For the year 2009, electronic discovery vendors had revenues equaling approximately $2.8 billion. *See* Arin Greenwood, *Law Practice: A New View, Part 2: E-*

retained Capital City Consulting ("CCC"), a North Carolina firm, and Hoosier retained Preferred Imaging and Xact Data Discovery. Based upon the vendors' invoices, RTA categorized the activities conducted by the vendors as follows: (1) preservation and collection of ESI; (2) processing the collected ESI; (3) keyword searching; (4) culling privileged material; (5) scanning and TIFF conversion; (6) optical character recognition ("OCR") conversion; and (7) conversion of racing videos from VHS format to DVD format.[6]

In total, Hoosier produced 430,733 pages of ESI, and DMS produced 178,413 documents in electronic format. In addition, ten DVDs of racing videos were produced. Hoosier paid its electronic discovery vendors, Preferred Imaging and Xact Data Discovery, more than $125,000. DMS claims to have incurred more than $240,000 in charges from CCC.

Discovery concluded on January 30, 2009. DMS and Hoosier each then moved for summary judgment. On

*Discovery Changes Have Some Seeing a Career in Document Review*, 97 A.B.A. J. 27, 27 (2011) (citing George Socha & Tom Gelbmann, *2010 Socha-Gelbmann Electronic Discovery Survey* (2010)).

[6] OCR is "[a] technology process that translates and converts printed matter on an image into a format that a computer can manipulate . . . and, therefore, renders that matter text searchable." The Sedona Conference, *supra* note 2, at 37.

September 15, 2009, the District Court granted the defense summary judgment motions. We affirmed the District Court's decision on July 23, 2010. *See Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 85 (3d Cir. 2010).

Following completion of the appeals process, the Clerk for the District Court proceeded to consider the Bills of Costs that had been presented by DMS and Hoosier pursuant to Federal Rule of Civil Procedure 54(d). On the line of the Bill of Costs form for "[f]ees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case," DMS claimed $329,051.41 (A. 143), and Hoosier claimed $143,007.05. (A. 82.) In response to RTA's objection to the DMS Bill of Costs, DMS acknowledged that the invoices of its vendor, CCC, "were exceedingly confusing and inconsistent." (A. 268.) As a result, DMS "mistakenly included duplicate invoices," and asserted that "its actual e-discovery costs [were] $241,139.37," an amount that was almost $88,000 less than its original claim. (A. 268.)

The Clerk of the District Court, in his Taxation of Costs, stated that "[t]his is the first case in the Western District of Pennsylvania that a party has requested [that electronic discovery] costs be taxed." (A. 29.) Noting that there was no precedent on this issue from this Court, and that the district courts across the country are divided on the issue, and further observing that the CMO set forth procedures for complying with electronic discovery requests, the Clerk concluded that electronic discovery costs would be "consider[ed] . . . taxable, as opposed to just . . . the costs of litigating." (A. 30.) In support of this conclusion, the Clerk distinguished the Western District of Pennsylvania's general

rule disallowing copying charges as "office expenses and part of the costs of litigation," (A. 21) (citing *Krouse v. American Sterilizer Co.*, 928 F. Supp. 543 (W.D. Pa. 1996)), stating that "the requirements and expertise necessary to retrieve and prepare these e-discovery documents [were] an indispensable part of the process." (A. 30.)

Of the $143,007.05 sought by Hoosier, the Clerk taxed the amount of $125,580.55. It reduced the claim for "copy charges" appearing in a general ledger with no supporting detail, as well as charges for services performed by Hoosier's law firm's Litigation Support Department, including OCR conversion, TIFF conversion, and electronic data discovery processing because, the Clerk explained, "these items were not done by a third party, and therefore are part of the costs of litigating."[7] (A. 31.) As to DMS, the Clerk awarded its full request of "e-discovery fees . . . in the amount of $241,778.81." (A. 32.)

RTA responded to the Clerk's taxation of costs by filing with the District Court a Motion to Appoint Special Master Regarding E-Discovery Issues and a Motion to Review Taxation of Costs. In a Memorandum Opinion issued on May 6, 2011, the District Court declined to appoint a Special Master and affirmed the Clerk's taxation of the electronic discovery vendor charges. *See Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, No. 2:07-cv-1294, 2011 WL 1748620, at *12 (W.D. Pa. May 6, 2011). After commenting on the contentious nature of the discovery and the extensive amount of ESI produced during the litigation,

---

[7] Hoosier did not contest the Clerk's reductions to its Bill of Costs.

11

and canvassing the extant case law, the District Court concluded that the entire amounts charged by the electronic discovery vendors were taxable. *Id.* In reaching this result, the District Court essentially found that "the steps the third-party vendor(s) performed appeared to be the electronic equivalent of exemplification and copying," (*id.* at *8), reiterating the Clerk of Court's comment that "the requirements and expertise necessary to retrieve and prepare . . . e-discovery documents for production were an indispensable part of the discovery process." *Id.* at *9. Without assessing each of the discrete functions performed by the vendors, the District Court also concluded that the vendors' charges were "necessarily incurred and reasonable." *Id.* at *10. In support of this conclusion, the District Court noted that the amounts charged by the vendors in this case were "within the parameters set forth in the case law." *Id.* Finally, the District Court made clear that it regarded its taxation of electronic discovery vendor costs as not establishing a precedent as to "how this Court or any other member of this Court will rule on future disputes regarding costs of e-discovery," explaining that it regarded "the facts and circumstances of this case [to be] unique." *Id.* at *12.

RTA timely appealed the District Court's taxation of the electronic discovery vendor charges. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

Federal Rule of Civil Procedure 54(d)(1) states that "[u]nless a federal statute, these rules, or court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." Although Rule 54(d)(1)

12

stipulates that "costs . . . *should* be allowed to the prevailing party," (emphasis added), Congress, in 28 U.S.C. § 1920, specified the litigation expenses that qualify as taxable "costs." *See Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 441 (1987) ("[Section] 1920 defines the term 'costs' as used in Rule 54(d)."). Section 1920 provides:

> A judge or clerk of any court of the United States may tax as costs the following:
> (1) Fees of the clerk and marshal;
> (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
> (3) Fees and disbursements for printing and witnesses;
> (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
> (5) Docket fees under section 1923 of this title;
> (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

At issue in this case is § 1920(4), "[f]ees for exemplification and the costs of making copies of any

13

materials where the copies are necessarily obtained for use in the case." Following the example of the late Judge Edward Becker in addressing other issues pertaining to the taxation of costs, we first examine "a page of history" to assist us in our understanding of § 1920(4). *In re Paoli R.R. Yard PCB Litig.*, 221 F.3d 449, 456 (3d Cir. 2000) (quoting *N.Y. Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921)) ("Upon this point a page of history is worth a volume of logic.").

Section 1920 is the modern codification of the Fee Act of 1853, ch. 80, 10 Stat. 161-69 (1853). *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 255 (1975). Prior to the 1853 Act, the federal courts' taxation of costs against losing litigants conformed to the state rules governing such matters, resulting in "great diversity in practice among the courts and . . . losing litigants . . . being unfairly saddled with exorbitant fees for the victor's attorney." *Id.* at 251. To avoid these problems, "Congress undertook to standardize the costs allowable in federal litigation." *Id.* "The result was a far-reaching Act specifying in detail the nature and amount of the taxable items of cost in the federal courts." *Id.* at 251-52.

The 1853 Act embodied the American "depart[ure] from the English practice of attempting to provide the successful litigant with total reimbursement." 10 Charles Alan Wright, Arthur R. Miller, Mary Kay Kane & Richard L. Marcus, *Federal Practice and Procedure* § 2665 (3d ed. 1998). The "American rule" against shifting the expense of litigation to the losing party is "founded on the egalitarian concept of providing relatively easy access to the courts to all citizens and reducing the threat of liability for litigation expenses as an obstacle to the commencement of a lawsuit or the assertion of a defense that might have some merit." *Id.*

14

The "substance [of the 1853 Act], without any apparent intent to change the controlling rules, was . . . included in the Revised [Judicial] Code of 1948 as 28 U.S.C. §§ 1920 and 1923(a)." *Alyeska Pipeline Serv. Co.*, 421 U.S. at 255. In *Crawford Fitting Co.*, the Court reiterated its understanding that "[t]he comprehensive scope of the [1853] Act and the particularity with which it was drafted demonstrated . . . that Congress meant to impose rigid controls on cost-shifting in federal courts." 482 U.S. at 444. In holding that expert witness fees are not taxable under § 1920(3) as "[f]ees and disbursements for printing and witnesses," the *Crawford Fitting Co.* Court essentially "rejected a line of authority recognizing other possible sources for an award of costs, including local rules, the custom of the district, and the court's general equitable powers." 6 James Wm. Moore et al., *Moore's Federal Practice* § 54.103(3)(a) (3rd ed. 1999).

Section 1920 thus "define[s] the full extent of a federal court's power to shift litigation costs absent express statutory authority." *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 86 (1991). "[W]hether a particular expense falls within the purview of section 1920, and thus may be taxed in the first place, is an issue of statutory construction, subject to de novo review." *Synopsys, Inc. v. Ricoh Co.* (*In re Ricoh Co. Patent Litig.*), 661 F.3d 1361, 1364 (Fed. Cir. 2011) (citing *Summit Tech., Inc. v. Nidek Co.*, 435 F.3d 1371, 1374 (Fed. Cir. 2006)).

The question presented here is whether § 1920(4) authorizes the taxation of an electronic discovery consultant's charges for data collection, preservation, searching, culling,

15

conversion, and production as either the "exemplification [or] the . . . making [of] copies of any materials where the copies are necessarily obtained for use in the case." § 1920(4). This language first appeared in § 3 of the 1853 Act, which in part provided that the "lawful fees for exemplifications and copies of papers necessarily obtained for use on trial . . . shall be taxed by a judge or clerk of the court." 10 Stat. 168. Section 3's language was carried over through to the 1948 revision of the Judicial Code with two substantive changes. *See* Judiciary and Judicial Procedure Act, ch. 646, 62 Stat. 955 (1948). The 1948 Act broadened the recoverable exemplification and copy fees from those "obtained for use on trials" to those "obtained for use in the case." *Id.* It also replaced the mandatory language of the prior statute, which read that costs "shall be taxed," to provide, consistent with the discretionary language of Rule 54(d)(1) of the Federal Rules of Civil Procedure, that the court "may tax as costs" any of the enumerated categories of expenses. *Id.*

The subdivision providing for the award of fees for exemplification and copying costs has been amended only once since 1948. In 2008, the statute's reference to "copies of papers" was replaced with "the costs of making copies of *any materials*." Judicial Administration and Technical Amendments Act of 2008, Pub. L. No. 110-406, § 6, 122 Stat. 4291 (2008) (emphasis added). This amendment to § 1920(4) originated with a recommendation of the Judicial Conference Committee on Court Administration and Case Management. *See* Judicial Conference of the U.S., *Report of the Proceedings of the Judicial Conference of the United States* 9 (Mar. 18, 2003). The Committee "was asked to consider whether the list of taxable costs should be amended to include expenses associated with new courtroom technologies." *Id.* at

16

9-10. The Committee, "[c]oncluding that adding the full range of such costs might go well beyond the intended scope of the statute, . . . recommended that the [Judicial] Conference endorse two limited amendments to 28 U.S.C. § 1920." *Id.* at 10. One of the two proposed "limited amendments" was "to permit taxing the costs associated with copying materials[,] whether or not they are in paper form." *Id.*

III.

RTA argues that the electronic discovery costs taxed against it do not constitute fees for "exemplification" or the "making of copies." (Appellant's Br. 23, 29.) Hoosier and DMS argue that their incurred electronic discovery costs fall within the statute's allowance for costs for "exemplification" and "making copies," without drawing any real distinction between the two terms. (DMS's Br. 6, Hoosier's Br. 11, 14) (internal citations omitted). We, however, do not think that the terms are interchangeable or synonymous. "It is a well-established canon of statutory interpretation that the use of different words or terms within a statute demonstrates that Congress intended to convey a different meaning for those words." *S.E.C. v. McCarthy,* 322 F.3d 650, 656 (9th Cir. 2003) (citations omitted). As we remarked in *Tavarez v. Klingensmith,* "[i]f possible, we must give effect to every clause and word of a statute, . . . and be reluctant to treat statutory terms as surplusage." 372 F.3d 188, 190 (3d Cir. 2004) (citations, internal quotation marks, and alteration omitted).

A.

Accordingly, we first determine whether the services for which the District Court taxed costs qualify as "exemplification" of materials. The courts that have differentiated "exemplification" from "making copies" in the context of § 1920(4) have reached different conclusions as to the term's meaning. In *Kohus v. Cosco, Inc.*, 282 F.3d 1355, 1361 (Fed. Cir. 2002), the Federal Circuit, applying Sixth Circuit law, reversed an award of the costs for producing a video exhibit. Observing that "Congress did not use the broad phrase 'demonstrative evidence' in section 1920," and predicting that the Sixth Circuit would apply the narrow "legal definition" of exemplification as "an official transcript of a public record, authenticated as a true copy for use as evidence," *id.* at 1359 (quoting *Black's Law Dictionary* 593 (7th ed. 1999)), the court ruled that the district court lacked "statutory authority to award costs for the video." *Id.*

The Seventh Circuit has interpreted "exemplification" expansively, as "the act of illustration by example," a definition "broad enough to include a wide variety of exhibits and demonstrative aids." *Cefalu v. Vill. of Elk Grove*, 211 F.3d 416, 427 (7th Cir. 2000) (citing *Merriam-Webster's Collegiate Dictionary* 406 (10th ed. 1993)). Thus, in the Seventh Circuit, exemplification fees may be awarded "[s]o long as the means of presentation furthers the illustrative purpose of an exhibit." *Id.* at 428.

There is no need to decide whether Congress used the term "exemplification" in its narrow "legal sense," or in the broader sense adopted by the Seventh Circuit. The electronic discovery vendors' work in this case did not produce illustrative evidence or the authentication of public records.

18

Their charges accordingly would not qualify as fees for "exemplification" under either construction of the term.

B.

We next consider § 1920's allowance for the "costs of making copies." The noun "copy" is defined as "an imitation, transcript, or reproduction of an original work." *Webster's Third New International Dictionary* 504 (3rd ed. 1993). The dictionary definition is consistent with its common use to denote something that is made to duplicate something else, usually an "original." For example, a 2,000-year-old copy of the Ten Commandments recently went on display in New York. The term "copy" helps to convey that we are not referring to the original stone tablets on which the commandments were inscribed; what is on display is a parchment copy of the original stone tablets. The word "copy" is frequently utilized to refer to "photocopies" or "xerox copies" – reproductions of documents made using "copy" machines. Indeed, since the advent of photocopying technology, the allowance for fees for "copies" under § 1920(4) has been relied upon by prevailing parties to recover photocopying costs. *See, e.g.*, *Northbrook Excess & Surplus Ins. Co. v. Procter & Gamble Co.*, 924 F.2d 633, 643 (7th Cir. 1991); *Tokyo Electron Ariz., Inc. v. Discreet Indus. Corp.*, 215 F.R.D. 60, 65 (E.D.N.Y. 2003); *Gen. Cas. Co. of Am. v. Stanchfield*, 23 F.R.D. 58, 60 (D. Mont. 1959). The most recent amendment to the statute, however, permitting an award to the prevailing party of the cost of making copies of "materials," plainly signifies that § 1920(4)'s allowance for copying costs is not limited to paper copying. We must accordingly decide whether any of the electronic discovery

vendor charges in this case qualify as the "costs of making copies of any materials."

The invoices that Hoosier and DMS submitted in support of their Bills of Costs are notable for their lack of specificity and clarity as to the services actually performed. For instance, Preferred Imaging invoices appended to the Bill of Costs have thousands of dollars in charges for "EDD Processing," without explaining what that activity encompasses. (A. 133.) And while Preferred Image's use of the phrase "Performing Searching/Filtering/Exporting" may be less obtuse, the invoices provide no indication of the rationale for these activities, nor their results in terms of the actual production of discovery material. (A. 133.) These activities also amount to thousands of dollars in charges. The CCC invoices are similarly replete with technical jargon that makes it difficult to decipher what exactly was done. RTA's brief was helpful in categorizing the invoices' numerous entries, and with its guidance, we identify the following general categories of services comprising the vendors' electronic discovery services: collecting and preserving ESI; processing and indexing ESI; keyword searching of ESI for responsive and privileged documents; converting native files to TIFF; and scanning paper documents to create electronic images.

Of the activities undertaken by the vendors, only the conversion of native files to TIFF (the agreed-upon default format for production of ESI), and the scanning of documents to create digital duplicates are generally recognized as the taxable "making copies of material." *See, e.g.*, *Hecker v. Deere & Co.*, 556 F.3d 575, 591 (7th Cir. 2009) (costs of "converting computer data into a readable format in response

20

to plaintiffs' discovery requests . . . are recoverable under 28 U.S.C. § 1920."); *BDT Prods. v. Lexmark Int'l, Inc.*, 405 F.3d 415, 420 (6th Cir. 2005) ("[E]lectronic scanning and imaging could be interpreted as 'exemplification and copies of papers.'"); *Brown v. McGraw-Hill Cos.*, 526 F. Supp. 2d 950, 959 (N.D. Iowa 2007) ("[T]he electronic scanning of documents is the modern-day equivalent of '. . . copies of paper,' and, therefore, can be taxed pursuant to § 1920(4)."). We agree that scanning and conversion of native files to the agreed-upon format for production of ESI constitute "making copies of materials."

In this case, the charges for scanning and TIFF conversion comprise only approximately $20,000 of the more than $365,000 in electronic discovery charges awarded in this case. RTA agrees that the format conversion charges are authorized under § 1920(4), but asserts that there has been no showing that the resulting digital copies were necessarily obtained for use in the case. Once statutory authority to tax costs has been established, however, the amount awarded is reviewed only for abuse of discretion. *See In re Paoli R.R. Yard PCB Litig.*, 221 F.3d at 458 ("Given the district court's discretionary equitable power to award costs under Rule 54(d)(1), taxation of costs is reviewed only for abuse of discretion.") (citations omitted). In light of the volume of ESI produced in this case, we cannot find that the inclusion of all scanning and TIFF conversion costs was an abuse of the District Court's discretion. Accordingly, we will affirm the taxation of $20,083.51, representing the scanning and TIFF conversion undertaken on behalf of Hoosier.[8]

---

[8] The CCC invoices do not disclose any charge for scanning or TIFF conversion.

Although perhaps not falling within the technical expertise of electronic discovery vendors, the cost of transferring VHS recordings to DVD format similarly qualifies as "making copies."  RTA, while acknowledging that this activity is taxable, disputes the amount taxed, observing that only 10 of 31 converted videos were produced to it.  Once again, however, the question of the amount of costs to be taxed for copies necessarily obtained for use in the case falls within the District Court's ample discretion, and we cannot find an abuse of discretion in the District Court's decision to tax the cost for transferring all of the videos, totaling $10,286.91.

The District Court, while acknowledging the lack of controlling precedent and the division of opinion among the federal courts outside of this Circuit, held that Hoosier and DMS were entitled to an award of *all* electronic discovery charges imposed by their electronic discovery vendors.  In reaching this decision, the District Court placed special reliance on *CBT Flint Partners, LLC v. Return Path, Inc.*, 676 F. Supp. 2d 1376 (N.D. Ga. 2009), *vacated*, 654 F.3d 1353, 1361 (Fed. Cir. 2011).[9]  In that case, the District Court rejected the plaintiff's objections to the defendant's claim for $243,453.02 in fees charged by the defendant's electronic discovery vendor "to collect, search, identify and help produce electronic documents from [the defendant's] network

---

[9] After the District Court's ruling in the matter before us, the Federal Circuit vacated the trial court's cost rulings because it had reversed the trial court's finding of patent invalidity.  *See CBT Flint Partners, LLC v. Return Path, Inc.*, 654 F.3d 1353, 1360 (Fed. Cir. 2011).

files and hard drives in response to [the plaintiff's] discovery requests." *Id.* at 1380. In overruling the plaintiff's objection, the District Court reasoned that the vendor's "highly technical" services were not "the type of services that attorneys or paralegals are trained for or are capable of providing." *Id.* at 1381. The District Court, acknowledging the statutory requirement, then remarked that "[the services] are the 21st Century equivalent of making copies." *Id.* The District Court did not explain how all the various services performed by the vendor to achieve the production of electronic documents amounted to "making copies," seemingly concluding that, because all the various services were necessary to the ultimate production of electronic "copies," the services were equivalent to one entire act of "making copies."

The District Court cited the *CBT Flint Partners, LLC* Court's reasoning in affirming the Clerk of Court's taxation of Hoosier's and DMS's electronic discovery costs, writing: "[a] careful review of the vendor's invoices reveals that the services provided were not the type of services that attorneys or paralegals are trained for or are capable of providing. The services were highly technical." *Race Tires Am., Inc.*, 2011 WL 1748620, at *9. The District Court also found it significant that the services performed by Hoosier's and DMS's electronic discovery vendors "to retrieve and prepare these e-discovery documents for production[,] were an indispensable part of the discovery process." *Id.*

Indeed, in the view of courts that have upheld the taxation of electronic discovery costs pursuant to § 1920(4), the "indispensability" of the services to the ultimate act of production of intelligible electronic documents has been a

23

significant factor. Those courts, like the *CBT Flint Partners, LLC* Court, explain that because the electronic discovery services are highly technical and beyond the expertise of the prevailing party's own attorneys, the fees that are incurred in retaining experts to perform the services are unavoidable. *See, e.g.*, *Tibble v. Edison Int'l*, No. CV 07-5359, 2011 WL 3759927, at \*7 (C.D. Cal. Aug. 22, 2011) (more than $500,000 in electronic discovery costs "necessarily incurred" to respond to plaintiff's discovery requests were taxable); *Parrish v. Manatt, Phelps, & Phillips, LLP*, No. C 10-03200 WHA, 2011 WL 1362112, at \*2 (N.D. Cal. Apr. 11, 2011) ("The tasks of collecting client documents, reviewing those documents, and determining which documents are relevant are essential—and often costly—parts of investigation and discovery."). Other courts have pointed to the efficiencies and cost savings resulting from the efforts of electronic discovery consultants as justification to tax their charges to the losing side. *See, e.g.*, *In re Aspartame Antitrust Litig.*, 2011 WL 4793239, at \*3 ("The court is persuaded that in cases of this complexity, e-discovery saves costs overall by allowing discovery to be conducted in an efficient and cost-effective manner.").

The decisions that allow taxation of all, or essentially all, electronic discovery consultant charges, such as the District Court's ruling in this case, are untethered from the statutory mooring. Section 1920(4) does not state that all steps that lead up to the production of copies of materials are taxable. It does not authorize taxation merely because today's technology requires technical expertise not ordinarily

24

possessed by the typical legal professional.[10]  It does not say that activities that encourage cost savings may be taxed. Section 1920(4) authorizes awarding only the cost of making copies.

It may be that extensive "processing" of ESI is essential to make a comprehensive and intelligible production.  Hard drives may need to be imaged, the imaged drives may need to be searched to identify relevant files, relevant files may need to be screened for privileged or otherwise protected information, file formats may need to be converted, and ultimately files may need to be transferred to different media for production.  But that does not mean that the services leading up to the actual production constitute "making copies."

The process employed in the pre-digital era to produce documents in complex litigation similarly involved a number of steps essential to the ultimate act of production.  First, the paper files had to be located.  The files then had to be collected, or a document reviewer had to travel to where the files were located.  The documents, or duplicates of the documents, were then reviewed to determine those that may have been relevant.  The files designated as potentially relevant had to be screened for privileged or otherwise protected material.  Ultimately, a large volume of documents would have been processed to produce a smaller set of

---

[10]  Significantly, the District Court in this case disallowed taxation of OCR and TIFF conversion performed by the "Litigation Support Department" of the law firm representing Hoosier, while taxing charges imposed by vendors for the same activities.  (A. 31.)

25

relevant documents. None of the steps that preceded the actual act of making copies in the pre-digital era would have been considered taxable. And that is because Congress did not authorize taxation of charges necessarily incurred to discharge discovery obligations. It allowed only for the taxation of the costs of making copies.

The result does not depend upon whether the activities leading up to the making of copies are performed by third party consultants with "technical expertise." As expressed by one court, "[s]ection 1920(4) speaks narrowly of '[f]ees for exemplification and copies of papers,' suggesting that fees are permitted only for the physical preparation and duplication of documents, not the intellectual effort involved in their production." *Romero v. City of Pomona*, 883 F.2d 1418, 1428 (9th Cir. 1989), *overruled in part on other grounds by Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1363 (9th Cir. 1991) (en banc). Neither the degree of expertise necessary to perform the work nor the identity of the party performing the work of "making copies" is a factor that can be gleaned from §1920(4).

Those courts that have refused to award the costs of electronic discovery vendors beyond file format conversion have recognized that gathering, preserving, processing, searching, culling, and extracting ESI simply do not amount to "making copies." For instance, in *Mann v. Heckler & Koch Defense, Inc.*, No. 1:08-cv-611, 2011 WL 1599580, at * 9 (E.D. Va. Apr. 28, 2011), the court observed that "such tasks as 'Searching and Deduping,' and 'Creation of Native File Database with Full Text and Metadata Extraction,'" do not qualify as "copying." Acknowledging the 2008 amendment to § 1920(4) that substituted "materials" for

"papers," the court aptly stated that the statute "still requires copying." *Id.* (emphasis omitted). In *In re Scientific-Atlanta, Inc. Securities Litigation*, No. 1:01-cv-1950-RWS, 2011 WL 2671296, at *1 (N.D. Ga. July 6, 2011), the court analogized keyword searching to a room full of reviewers physically reviewing paper documents. Just as the cost of reviewers examining documents is not taxable, so too the task of keyword searching is not taxable. *Id.* In *In re Fast Memory Erase v. Spansion, Inc.*, the court awarded nearly $200,000 "for creating TIFF/OCR images of documents responsive to plaintiff's discovery requests," but disallowed more than $860,000 "for collecting and processing more than 2,100 gigabytes of . . . ESI." No. 3-10-CV-0481-M-BD, 2010 WL 5093945, *4 (N.D. Tex. Feb. 2, 2010). The court found that data collection and extraction of relevant discoverable ESI was more like non-taxable attorney and paralegal review than copying. *Id.* at *6 (citing *Kellogg Brown & Root Int'l, Inc. v. Altanmia Commercial Mktg. Co.*, *W.W.L.*, No. H-07-2684, 2009 WL 1457632 at *6 (S.D. Tex. May 26, 2009)).

These decisions recognize that "the types of costs recoverable under Rule 54(d)(1) are circumscribed." *In re Paoli R.R. Yard PCB Litig.*, 221 F.3d at 457. They are also consistent with the Supreme Court's "precept that district courts . . . cannot award costs not enumerated under § 1920." *Fells v. Va. Dep't of Transp.*, 605 F. Supp. 2d 740, 743-44 (E.D. Va. 2009) (refusing to tax costs of processing records, extracting data, and converting files). Nor may the courts invoke equitable concerns, as appears to have been an animating factor in this case, to justify an award of costs for services that Congress has not made taxable. *See Romero*, 883 F.2d at 1428.

Hoosier argues that the services leading to the ultimate act of production cannot be parsed into taxable and non-taxable activities, asserting that "this approach ignores the reality that many technical processes are necessary for the production of intelligible electronic copies." (Hoosier's Br. 21.) A review of the invoices in this matter belies Hoosier's assertion. As demonstrated by the courts that have taxed the cost of scanning and file format conversion while not taxing other activities, it is possible to tax only the costs incurred for the physical preparation of ESI produced in litigation. *See*, *e.g.*, *In re Fast Memory Erase*, 2010 WL 5093945, at *4 (awarding nearly $200,000 for TIFF/OCR conversion but disallowing more than $860,000 for collecting and processing in excess of 2,100 gigabytes of ESI). The highly technical nature of the services simply does not exempt parties who seek to recover their electronic discovery costs under § 1920(4) from showing that the costs fall within the subsection's limited allowance for "the costs of making copies of any materials where the copies are necessarily obtained for use in the case."

Furthermore, we do not think it is significant that the Federal Rules of Civil Procedure provide for the discovery of ESI or that the parties agreed to "exchange responsive and discoverable ESI." (A. 79.) Indeed, there is a "presumption . . . that the responding party must bear the expense of complying with discovery requests." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 358 (1978). A responding party, however, "may invoke the district court's discretion under Rule 26(c) to grant orders protecting him from 'undue burden or expense' in [complying with discovery requests], including orders conditioning discovery on the requesting party's payment of the costs of discovery." *Id.* Here, neither

Hoosier nor DMS obtained a cost-shifting protective order. We are consequently limited to shifting only those costs explicitly enumerated in § 1920.[11] *Crawford Fitting Co.*, 482 U.S. at 441.

---

[11] In addition to *CBT Flint Partners, LLC*, Hoosier relies on a recent decision from the Federal Circuit, *Synopsys, Inc. v. Ricoh Co. (In re Ricoh Co. Patent Litigation)*, 661 F.3d 1361 (Fed. Cir. 2011), in support of its position that electronic discovery costs are taxable under § 1920(4). In that case, the parties had agreed to have a third party vendor load and host e-mails in native format in a secure document review database. *Id.* at 1364-65. Furthermore, the parties agreed to share the cost of creating and maintaining the document review database. *Id.* at 1365. The Federal Circuit, although finding that the cost of an agreed-upon database that served as the platform for the parties to obtain documents was taxable, reversed the District Court's award of those costs because the parties had agreed to share that expense. *Id.* at 1367. *In re Ricoh Patent Litigation* is plainly distinguishable because the parties had agreed to the creation of a specific document review database by a specific vendor for document production purposes, unlike this case, where Hoosier and DMS retained their own electronic discovery consultants. Furthermore, we have acknowledged that the costs of conversion to an agreed-upon production format are taxable as the functional equivalent of "making copies." It is all the other activity, such as searching, culling, and deduplication, that are not taxable. *In re Ricoh Patent Litigation* affords no assistance to Hoosier and DMS in this regard, as it did not address the question of whether the activities undertaken by the electronic discovery vendors in this case are the equivalent of "making copies."

III.

Neither the language of § 1920(4), nor its history, suggests that Congress intended to shift all the expenses of a particular form of discovery—production of ESI—to the losing party. Nor can such a result find support in Supreme Court precedent, which has accorded a narrow reading of the cost statute in other contexts. *See, e.g.*, *Crawford Fitting Co.,* 482 U.S. at 442. Although there may be strong policy reasons in general, or compelling equitable circumstances in a particular case, to award the full cost of electronic discovery to the prevailing party, the federal courts lack the authority to do so, either generally or in particular cases, under the cost statute.[12]

In sum, we conclude that of the numerous services the vendors performed, only the scanning of hard copy documents, the conversion of native files to TIFF, and the transfer of VHS tapes to DVD involved "copying," and that the costs attributable to only those activities are recoverable under § 1920(4)'s allowance for the "costs of making copies of any materials." Those costs total $30,370.42. We find that none of the charges imposed by DMS's vendor are taxable,

---

[12] Cost-shifting may be effected during the course of litigation, either by agreement or pursuant to court order issued under the authority of Fed. R. Civ. P. 26. After litigation, cost-shifting may be ordered as a sanction for vexatious conduct that reflects bad faith, as opposed to "misunderstanding, bad judgment, or well-intentioned zeal." *LaSalle Nat'l Bank v. First Conn. Holding Grp., LLC*, 287 F.3d 279, 289 (3d Cir. 2002) (citations omitted).

and that the award in favor of Hoosier should be reduced by $95,210.13, the difference between the electronic discovery vendors' charges awarded by the District Court ($125,580.55) and the charges of Hoosier's electronic discovery vendors we find taxable ($30,370.42). We will accordingly vacate the District Court's award of costs and remand to the District Court to re-tax costs in accordance with this opinion.