# United States Court of Appeals for the Federal Circuit

---

**CBT FLINT PARTNERS, LLC,**
*Plaintiff-Appellant,*

v.

**RETURN PATH, INC.,**
*Defendant-Appellee,*

AND

**CISCO IRONPORT SYSTEMS, LLC,**
*Defendant-Appellee.*

---

2013-1036

---

Appeals from the United States District Court for the Northern District of Georgia in No. 07-CV-1822, Judge Thomas W. Thrash, Jr.

---

Decided: December 13, 2013

---

ADAM M. CONRAD, King & Spalding, LLP, of Charlotte, North Carolina, argued for plaintiff-appellant. With him on the brief were DARYL L. JOSEFFER and KAREN F. GROHMAN, of Washington, DC; and BRUCE W. BABER, NATASHA H. MOFFITT and RUSSELL E. BLYTHE, of Atlanta, Georgia.

MATTHEW C. GAUDET, Duane Morris LLP, of Atlanta, Georgia, argued for all defendants-appellees. With him on the brief were L. NORWOOD JAMESON and JOHN R. GIBSON for defendant-appellee Cisco Ironport Systems, LLC. On the brief was KENNETH L. BRESSLER, Blank Rome LLP, of New York, New York, for defendant-appellee, Return Path, Inc.

ANDREW J. PINCUS, Mayer Brown, LLP, of Washington, DC, for amicus curiae The Software Alliance. With him on the brief was PAUL W. HUGHES.

---

Before DYK, O'MALLEY, and TARANTO, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* TARANTO.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* O'MALLEY.

TARANTO, *Circuit Judge.*

CBT Flint Partners, LLC, sued Return Path, Inc., and Cisco IronPort Systems, LLC, in the Northern District of Georgia for patent infringement. After deciding the merits of the case against CBT, the district court ruled that CBT should have to pay the defendants their "costs," which the clerk taxed at $49,824.60 for Return Path and $268,311.12 for Cisco. In the present appeal by CBT, we hold that the district court erred in its interpretation of the statutory provision governing the taxation of costs here, 28 U.S.C. § 1920(4). We reverse in part, vacate in part, and remand.

## BACKGROUND

On August 1, 2007, CBT sued Return Path and Cisco for infringement of U.S. Patent Nos. 6,192,114 and 6,587,550. After the district court construed the patent claims at issue, CBT stipulated to noninfringement of the asserted claims of the '114 patent, and the district court

granted summary judgment of indefiniteness of the one asserted claim of the '550 patent. *See CBT Flint Partners, LLC v. Return Path, Inc.*, 676 F. Supp. 2d 1376, 1377-78 (N.D. Ga. 2009). Cisco then moved to recover its costs under 28 U.S.C. § 1920, including $243,453.02 in fees it had paid to a company that handled electronic discovery for it. *Id.* at 1380. Rather than fit that amount into a specific section 1920 category, Cisco labeled those fees "other costs" on its bill of costs.

In 2009, the district court granted Cisco's motion after noting "a division of opinion as to whether [electronic discovery] costs are recoverable under 28 U.S.C. § 1920." *Id.* at 1381. Based on a "careful review" of the vendor's invoices to Cisco, the court characterized the services rendered as "highly technical" and "not the type of services that attorneys or paralegals are trained for or are capable of providing." *Id.* The court concluded that the fees Cisco sought to recover were "the 21st Century equivalent of making copies" (although Cisco had not categorized them as such) and held them to be recoverable. *Id.* Thus, although the court did not cite any specific provision of section 1920, it implicitly rested the taxation of Cisco's electronic-discovery costs on section 1920(4), which covers "the costs of making copies." In awarding Cisco the requested amounts, the court said that the "enormous burden and expense of electronic discovery are well known" and that "[t]axation of these costs will encourage litigants to exercise restraint in burdening the opposing party with the huge cost of unlimited demands for electronic discovery." *Id.*

On appeal, this court reversed the district court's summary judgment of indefiniteness regarding the '550 patent, construed the claim in question, and remanded for further proceedings. *CBT Flint Partners, LLC v. Return Path, Inc.*, 654 F.3d 1353, 1355 (Fed. Cir. 2011). Because Cisco was no longer a prevailing party, this court vacated the district court's order on costs without addressing its

correctness. *Id.* at 1361. On remand, the district court granted summary judgment of noninfringement, *CBT Flint Partners, LLC v. Return Path, Inc.*, 870 F. Supp. 2d 1369, 1377 (N.D. Ga. 2012)—which this court has since summarily affirmed, 501 F. App'x 980 (Fed. Cir. 2013).

On July 30, 2012, after granting summary judgment, the district court entered an amended final judgment and decided that Return Path and Cisco were entitled to recover their costs. Each party submitted a bill of costs identifying the fees to be taxed. Return Path declared that it had incurred $49,824.60 in total costs, none of which it identified as costs for copies. Cisco submitted the same bill of costs as the one it had submitted after the original judgment, declaring $268,311.12 in total costs, of which it identified only $4,473.10 as costs for making copies. In the declared amounts, both defendants included the fees they had paid to their electronic-discovery vendors, listing them in a catchall "other" category. For Return Path, those fees were $33,858.51; for Cisco, they remained $243,453.02, as in 2009.

On August 2, 2012, the clerk taxed each party's costs in the full amounts requested. The district court denied CBT's motion to review the taxation of costs. It deemed the motion "in effect a motion for reconsideration of the Court's previous [2009] Order affirming the taxation of the Defendants' e-discovery costs" and stated that "[t]he Court declines the opportunity to revisit the subject." *CBT Flint Partners*, No. 1:07-cv-1822-TWT (N.D. Ga. Sept. 18, 2012) (ECF No. 329).

CBT appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

## DISCUSSION

Federal Rule of Civil Procedure 54(d)(1) authorizes district courts to award costs to the prevailing party. In turn, 28 U.S.C. § 1920 "enumerates expenses that a

federal court may tax as a cost under the discretionary authority found in Rule 54(d)." *Crawford Fitting Co. v. J. T. Gibbons, Inc.*, 482 U.S. 437, 441-42 (1987); *see also Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, 2006 (2012). Thus, section 1920 operates as a limitation on a court's discretion to award costs under Rule 54(d)(1). *Crawford*, 482 U.S. at 445; *Taniguchi*, 132 S. Ct. at 2006. The scope of that limitation—specifically, the meaning of section 1920(4)—is the subject of CBT's appeal. We review the district court's interpretation of section 1920(4) de novo, applying the law of the regional circuit (in this case, the Eleventh Circuit). *In re Ricoh Co., Ltd. Patent Litig.*, 661 F.3d 1361, 1364 (Fed. Cir. 2011). Subject to a proper interpretation of section 1920(4), we review the district court's award of costs for abuse of discretion. *Id.*

## A

Before Congress enacted the Judicial Administrative and Technical Amendments Act of 2008, Pub. L. No. 110-406, § 6(2), section 1920(4) covered "[f]ees for exemplification and *copies of papers* necessarily obtained for use in the case." 28 U.S.C. § 1920 (2007) (emphasis added). Congress changed the language as of October 13, 2008, to encompass electronically stored information as well as information on paper. Section 1920(4) now covers "[f]ees for exemplification and *the costs of making copies of any materials where the copies are* necessarily obtained for use in the case." 28 U.S.C. § 1920(4) (emphasis added).

The Eleventh Circuit has not addressed section 1920(4) since it was amended. The Eleventh Circuit's pre-amendment precedent, however, expressed the general principle that section 1920(4) "allows recovery only for the reasonable costs of actually duplicating documents, not for the cost of gathering those documents as a prelude to

duplication." *Allen v. U.S. Steel Corp.*, 665 F.2d 689, 697 n.5 (5th Cir. Unit B 1982).[1]  We interpret the scope of amended section 1920(4) in accordance with that principle, making necessary allowances for the inherent differences between paper and electronic documents.

That principle is our guide because neither the language of section 1920(4) nor its legislative history supplies a basis for departing from it.  The new statutory language embraces "making copies of any materials" that meet certain requirements.  But that language leaves for the courts the task of defining what constitutes "making copies" for purposes of sifting the activities that go into producing electronic documents.  For that crucial task, we see no significance in the change from "copies" to "making copies," a change that appears to reflect no more than the linguistic aim of using activity-describing phrases ("exemplification," "making copies") on both sides of the conjunction in section 1920(4).

The legislative history confirms, as one sponsor indicated, that the new language would "mak[e] electronically produced information coverable in court costs."  154 Cong. Rec. H10270, H10271 (daily ed. Sept. 27, 2008) (statement of Rep. Lofgren).  But neither that statement nor another key legislator's statement that the amendments as a whole seek "to keep up with the changes and challenges of the 21st century," 154 Cong. Rec. S9897, S9898 (daily ed. Sept. 27, 2008) (statement of Sen. Leahy), provides further help for courts that must apply the statutory language.  They do not say that the new language covers all, or even a significant share, of the costs of electronic-

---

[1]    Fifth Circuit Unit B decisions rendered after October 1, 1981, are binding precedent in the Eleventh Circuit.  *United States v. Maxwell*, 579 F.3d 1282, 1305 n.6 (11th Cir. 2009).

document production. And they do not clarify what activities constitute "making copies."

The process leading to the 2008 amendment of section 1920 tends to suggest that the change was modest rather than dramatic in its bottom-line effect on litigants. The proposed language was recommended to Congress in 2003 by the Judicial Conference Committee on Court Administration and Case Management, which considered the possibility of large-scale changes in section 1920 but proposed only small-scale changes instead, explaining:

> The Committee agreed that § 1920 does not address many of the technology expenses that are now often expended in federal litigation. The Committee was concerned, however, that the charges for these new expenses could dramatically expand the intention of the statu[t]e, which was to allow the taxing of costs in a very limited way. Therefore, the Committee decided to recommend that the Judicial Conference endorse two limited statutory amendments to 28 U.S.C. § 1920. The first would amend subsection (2) to recognize the availability of transcripts in electronic form. The second would expand the concept of "papers" in subsection (4) in order to reflect the decreasing use of paper and the increasing use of technology in creating, filing, and exchanging court documents.

Rep. of the Judicial Conference Comm. on Court Administration and Case Management, at 4 (March 2003). In 2004, Senator Hatch introduced the recommended language, noting the origin of the whole bill in the Judicial Conference. *See* S. 2396, 108th Cong. § 118 (2d Sess. 2003); 150 Cong. Rec. S5080, S5082 (May 10, 2004). The accompanying Section-by-Section Analysis included the observations that the section 1920 changes generally "would incorporate *some* of the expenses associated with

new courtroom technologies into the assessment of litigation costs" and the copying provision in particular "would also expand the concept of 'papers' in order to reflect the decreasing use of paper and the increasing use of technology in creating, filing, and exchanging court documents." *Id.* at S5087 (emphasis added).

The Judicial Conference Committee's view that section 1920 has long been understood to "allow the taxing of costs in a very limited way" rests on the Supreme Court's explanation that the congressional policy behind the enactment of section 1920 was to place "rigid controls on cost-shifting in federal courts." *Crawford*, 482 U.S. at 444. The Supreme Court reiterated that understanding in *Taniguchi*, which, in discussing another provision of section 1920 after the 2008 amendment, reiterated "the narrow scope of taxable costs," their "modest" scope, their limitation "to relatively minor, incidental expenses." 132 S. Ct. at 2006. Earlier, and more generally, the Supreme Court stated the "presumption" that the costs of meeting discovery requirements stay with the litigant that incurred them. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 358 (1978). Without a clearer prescription of dramatic change than we can find in the 2008 amendment, those background principles call for reading the new language to effect only modest changes in the award of costs under the generally applicable section 1920(4)—leaving larger-scale shifting of litigation expenses to be addressed under other statutory provisions that set particular standards for particular types of cases to implement context-specific policies.

Our own precedent provides some important guidance in deciding which electronic-document-production tasks fall within section 1920(4). In *In re Ricoh*, 661 F.3d at 1367, we acknowledged the applicability of section 1920(4) to electronic documents. We also confirmed several critical limitations on the reach of the provision even as to paper documents (and therefore as to electronic docu-

ments): it applies only to documents produced to a requester, not those a party creates for its own litigation or other use; it applies only if "the reproduced documents were produced . . . pursuant to Rule 26 or other discovery rules"; and the parties may enter into binding cost-allocation agreements. *Id.* at 1367, 1368. But *Ricoh* (which involved Ninth Circuit law, not Eleventh Circuit law) did not otherwise reach the question of which specific costs of electronic-document production were properly taxable as costs of "making copies," because the parties had an agreement to share costs. *Id.* at 1364-67.

In accord with the Eleventh Circuit's pre-amendment principle, the caution favoring modesty in section 1920(4)'s real-world effect, and *Ricoh*'s explanation that its scope is tied to what is required to fulfill a request, we conclude that recoverable costs under section 1920(4) are those costs necessary to duplicate an electronic document in as faithful and complete a manner as required by rule, by court order, by agreement of the parties, or otherwise. To the extent that a party is obligated to produce (or obligated to accept) electronic documents in a particular format or with particular characteristics intact (such as metadata,[2] color, motion, or manipulability), the costs to

---

[2] The term "metadata" may encompass different types of data associated with a particular document. In a glossary that is relied on extensively in *Race Tires America, Inc. v. Hoosier Racing Tire Corp.*, 674 F.3d 158 (3d Cir. 2012), the Sedona Conference defines metadata generally as follows:

Data typically stored electronically that describes characteristics of ESI [electronically stored information], found in different places in different forms. Can be supplied by applications, users or the file system. Metadata can describe how, when,

make duplicates in such a format or with such characteristics preserved are recoverable as "the costs of making copies . . . necessarily obtained for use in the case." 28 U.S.C. § 1920(4). But only the costs of creating the produced duplicates are included, not a number of preparatory or ancillary costs commonly incurred leading up to, in conjunction with, or after duplication.

B

In this case, some of the costs taxed against CBT clearly come within section 1920(4), while others clearly fall outside it. To indicate why, and to try to guide the necessary work of locating particular expenses on one side of the line or the other, we review the document production process used in this case. There was a basic agree-

---

and by whom ESI was collected, created, accessed, modified, and how it is formatted. Can be altered intentionally or inadvertently. Certain metadata can be extracted when native files are processed for litigation. Some metadata, such as file dates and sizes, can easily be seen by users; other metadata can be hidden or embedded and unavailable to computer users who are not technically adept. Metadata is generally not reproduced in full form when a document is printed to paper or electronic image.

The Sedona Conference, *The Sedona Conference Glossary: E-Discovery & Digital Information Management* 34 (Sherry B. Harris et al. eds., 3rd ed. 2010). The Sedona Conference provides additional definitions for specific types of metadata, including Application Metadata, Document Metadata, Email Metadata, Embedded Metadata, File System Metadata, User-Added Metadata, and Vendor-Added Metadata.

ment at oral argument that the process followed here can, for our purposes, be broken down into three stages.

At stage one, an electronic-discovery vendor copied (or "imaged") computer hard drives or other "source media" that contain the requested documents, replicating each source as a whole in its existing state. *See Sedona Conference Glossary* at 23 (A "forensic copy" is "[a]n exact copy of an entire physical storage media (hard drive, CD-ROM, DVD-ROM, tape, etc.), including all active and residual data and unallocated or slack space on the media. Forensic copies are often called 'images' or 'imaged copies.'"); *id.* at 27 (first definition of "image": "(1) To image a hard drive is to make an identical copy of the hard drive, including empty sectors. Also known as creating a 'mirror image' or 'mirroring' the drive."). The vendor then processed the whole-source images to extract individual documents, leaving the documents' original properties intact.

At stage two, the extracted documents were organized into a database. They were then indexed, decrypted, and de-duplicated,[3] and filtered, analyzed, searched, and

---

[3] The Sedona Conference defines "De-Duplication" as follows:

> The process of comparing electronic records based on their characteristics and removing or marking duplicate records within the data set. The methodology deployed and definition of "duplicate records" should be agreed upon, i.e., whether an exact copy from a different location (such as a different mailbox, server tapes, etc.) is considered to be a duplicate. De-duplication can be selective, depending on the agreed-upon criteria.

*Sedona Conference Glossary* at 14.

reviewed to determine which were responsive to discovery requests and which contained privileged information. These processes resulted in identification of a subset of documents for production.

At stage three, the documents selected for production were copied onto memory media, such as hard drives or DVDs, or, in the case of source code, onto a secured computer. Such "production media" were then delivered to the requester CBT or, in the case of source code, made available for review in a secured location. In this case, unlike other cases, the documents were not converted to an "image file" format, such as Tagged Image File Format (TIFF), because Cisco believed that such conversion would be too expensive.

We consider these three stages in turn.

1

In many cases, an agreement, rule, court order, or other requirement regarding the format of the copies to be produced may necessitate the taking of several steps that are all part of "making copies," reasonably understood. If documents must be converted to a uniform production format (for instance, TIFF), a party often must make a first copy of a document, perform the required format conversion, and then copy the converted files to production media. Similarly, a party may be under an obligation to produce documents with pre-collection metadata intact. In such a situation, because the mere act of copying a file may destroy certain types of metadata, *see, e.g.*, *Sedona Conference Glossary* at 3 (definition of "Application Metadata," noting that "copying may alter application metadata"), it is often necessary—in order to produce a single production copy of the document's visible content and of the metadata (where both are requested)—to create an image of the original source first and then to apply special techniques to extract documents while preserving all associated metadata.

Those steps are fairly considered costs of making copies of the requested documents. We do not see why it makes a difference that the process of making a single production copy may involve first creating one electronic duplicate of the two-part "document" (visible content, metadata), then creating a production copy of each part. The statute would surely cover the costs of using a modern digital photocopier (essentially a scanner combined with a printer) for copying a paper document, notwithstanding that such a machine may first scan the document to create a duplicate on an internal hard drive and then create a paper duplicate, all in making "one copy."[4] Notably, both the Third and Fourth Circuits, in their recent decisions addressing issues similar to those we address, have recognized that the statute covers costs for steps, which commonly involve an initial reproduction, that necessarily precede the creation of a final production copy: converting electronic files to non-editable formats, *Country Vintner of N. Carolina, LLC v. E. & J. Gallo Winery, Inc.*, 718 F.3d 249, 260 (4th Cir. 2013), and scanning paper documents, *Race Tires*, 674 F.3d at 171.

At present, enough expertise and specialized equipment often are required that many parties entrust these tasks to an electronic-discovery vendor. Whoever performs them, however, the steps described are all fairly included in section 1920(4) where they are, in fact, necessary to make copies of information required to be produced and not incurred just to make copies for the convenience of the producing party. For example, if metadata can be preserved without first using imaging and extraction techniques, then those steps are outside

---

[4] On the nature of a modern digital copier, see, *e.g.*, *Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1296 (Fed. Cir. 2002).

section 1920(4). And if a vendor does its chargeable work (*i.e.*, work covered by the statute if performed on a single document) on a large volume of documents *before* culling to produce only a subset, the awarded copying costs must be confined to the subset actually produced, *e.g.*, by using document-specific charges if they are available or by using a reasonable allocation method such as prorating. On the other side of the line, costs incurred in *preparing* to copy are not recoverable. Though Cisco and its vendor apparently put in considerable time deciding on a plan for securely copying its source code, items on the vendor invoices such as "source code planning," "source code discussion," "plans for acquisition of source code," "coordination meeting for source code processing," and "source code briefing" (and perhaps others) are not recoverable.

In contrast to the above scenarios, if a party from whom documents are sought is subject to no particular requirements governing the format or other characteristics of the produced documents, it might suffice for the producing party to copy the requested documents directly from the source media to the production media and deliver the production media directly to the requester. In that event, only the costs of that simpler process will be chargeable under section 1920(4). Of course, proceeding in that way might, for both producer and requester alike, significantly complicate other needed aspects of the litigation process, such as document review. A requester may therefore decide to request a production in a form that increases copying costs while saving other litigation costs. But if not, the costs are limited to the duplication needed for the production in the form required. At the same time, the producing party might choose, for the efficiency of its own litigation work, to image source drives and upload the images to a document database for faster filtering, searching, and review. That choice, however, would not change the costs chargeable to the

requester as part of the costs of making copies under section 1920(4).

How this analysis applies in full to the specific bills of costs in this case requires an inquiry that the district court should perform in the first instance. The court should determine what requirements governing the format or other characteristics of the produced documents were imposed on the defendants. At least in this case, looking back to events some years ago, the court may have to resort to a determination of well-grounded expectations about default requirements in the absence of contrary agreements, rules, or orders. In the future, default standards should become clearer, and pre-copying court orders or parties' agreements should determine more affirmatively and definitively what form of copying is required in a particular case.

2

Return Path and Cisco seek to recover under section 1920(4) the costs of a host of their vendors' services that fall under what we have called stage two. Examples are activities that they characterize as project management, keyword searching, "statistical previews," "auditing and logging of files and ensuring compliance with Federal Rules," and "extraction of proprietary data," among others. The costs of those activities are not the costs of making copies. Rather, they are part of the large body of discovery obligations, mostly related to the document-review process, that Congress has not included in section 1920(4).

Similarly, the costs incurred in acquiring, installing, and configuring a new data-hosting server at the offices of Cisco's counsel were clearly incurred for the convenience of Cisco and its counsel and are not recoverable. Neither should a party be able to recover the costs of litigation-support tasks such as training in the use of the document-review software, deposition support, or production- and

privilege-log creation. Costs of other activities listed on the vendor's invoices here, such as meetings, conference calls, and other communications, also are not costs of "making copies," even when they relate to the copying process.

Although Cisco argues that much of the keyword searching and data analysis performed by the vendor in this case was at CBT's request, that is plainly insufficient to bring an activity within section 1920(4). The provision covers only "making copies." Although the requester's demands can define the number, form, and other characteristics of copies chargeable under section 1920(4), the requester's demands for activities other than making copies does not bring those non-copying activities within the provision. A litigant faced with what it views as overbroad discovery requests or vexatious discovery tactics—or even unduly fruitless or burdensome negotiations over discovery obligations—must pursue relief by other means, such as seeking court orders to limit the discovery when the problems arise or seeking reimbursement of costs or fees or payment of penalties afterwards under authority other than section 1920(4).

Applying section 1920(4) to various other stage-two tasks involved in electronic-document production calls for some common-sense judgments guided by a comparison with the paper-document analogue. Thus, decryption of a document stored in encrypted form on an electronic source medium may be necessary to make a final production copy that is viewable by the requester, *see*, *e.g.*, Fed. R. Civ. P. 34(b)(2)(E)(ii) (requiring production of electronically stored information "in a reasonably usable form"); *id.* Rule 34(a)(1)(A) (requiring "translation" if necessary into such form), but we conclude that the cost to decrypt is not recoverable. After the original creators or users of an electronic document have viewed it in readable form, it may have been put into an encrypted form for safekeeping. If so, the process of decryption to restore it to the

form in which its creators and users saw it is something that is best understood as preceding copying, not as part of copying. By analogy, if a party chooses to store paper documents in a secure way—say, to place them in a safe in remote Tuva—the party's expense in removing them from such security, and getting them to the duplication machine, would not naturally constitute "making copies." Decryption of electronic documents is similar enough that it too should not constitute making copies.

Likewise, deduplication is not fairly covered by section 1920(4). Deduplication is the culling of a set of documents to eliminate duplicate copies of the same document, creating a smaller set for production or review. This is either pre- or post-copying activity (depending on when the culling is done), not itself the making of copies. This process may well be valuable to both sides in making post-copying review more efficient, and the parties can agree on who incurs the cost. But it is not a cost of "making copies."

In contrast, we conclude that the creation of "load files" is covered to the extent that those files contain information required by the requested production. The Sedona Conference defines a "load file" as follows:

> A file that relates to a set of scanned images or electronically processed files, and indicates where individual pages or files belong together as documents, to include attachments, and where each document begins and ends. A load file may also contain data relevant to the individual documents, such as selected metadata, coded data, and extracted text. Load files should be obtained and provided in prearranged or standardized formats to ensure transfer of accurate and usable images and data.

*Sedona Conference Glossary* at 31. Some of the basic information in load files is comparable to the slip sheets

(blue sheets of paper, say) used to separate distinct documents in a paper production. Although district courts are divided on whether the costs of slip sheets are recoverable, *see, e.g.*, *Warner Chilcott Labs. Ireland Ltd. v. Impax Labs., Inc.*, Case No. 08-6304 WJM, 2013 WL 1876441 (D.N.J. Apr. 18, 2013) (fees for items such as slip sheets not recoverable); *eBay Inc. v. Kelora Sys., LLC*, Case No. 10-4947 CW (LB), 2013 WL 1402736 (N.D. Cal. Apr. 5, 2013) (slip sheet and load file preparation recoverable), we think that the better view, as a default matter, is that they are recoverable: unless something to the contrary is said, a request for documents is properly understood as a request that they be produced in a way that separates them to indicate where one ends and another begins. The "load file" counterpart is the start-stop information. Sometimes load files also contain additional information that is effectively part of the requested and produced documents. Whether such information is covered by section 1920(4), such as metadata or extracted text, should depend on whether that information is required to be produced, in which case it is part of the cost of "making copies."

Other particular stage-two activities call for a similar analysis. Judgment calls in the nature of line-drawing are required. Whatever imprecision is involved, it is worth reiterating that the resulting judgments establish only default rules. Relative clarity in such default rules should make it easier for requesting parties to define their requests with the consequences known in advance and for both parties to know what is at stake in any attempt to agree on a different allocation of costs.

3

As to stage three, there is no dispute among the parties that the costs of copying responsive documents to production media are recoverable under section 1920(4). We agree.

These costs as they relate to the production of source code in this case warrant separate mention. Where legitimate trade-secret concerns entitle a producing party to use a special form of production media (such as making production copies available for review on a secured computer, rather than allowing the requester to take possession of the production copies), the costs of such production media are recoverable under section 1920(4). Covered costs include the costs incurred in providing a secured computer for the time the requester is entitled to access to it, installing on the secured computer whatever review software the requester requires, and copying the source code files to the secured computer. As noted above, costs incurred in planning, preparation, coordination, and communications associated with those tasks are not recoverable.

## C

The general approach outlined above, and most of the applications we have set out, are consistent with the analysis of other circuits that have interpreted section 1920(4) to allow for only limited recovery of the costs of electronic-document production. *See, e.g.*, *Country Vintner*, 718 F.3d at 260 (allowing costs of converting electronic files to non-editable formats and burning the files onto discs); *Race Tires*, 674 F.3d at 171 (allowing costs of scanning hard-copy documents, converting file format to production format, and transferring of VHS tapes to DVD); *Hecker v. Deere & Co.*, 556 F.3d 575, 591 (7th Cir. 2009) (allowing costs of converting computer data into a readable format); *BDT Prods., Inc. v. Lexmark Int'l, Inc.*, 405 F.3d 415 (6th Cir. 2005) (allowing costs of electronic scanning and imaging).

Our application of section 1920(4) apparently differs from two circuits in one way—regarding the stage-one costs of imaging source media and extracting documents in a way that preserves metadata. In *Race Tires*, the

Third Circuit put hard-drive imaging and metadata extraction in the same category as unrecoverable preparatory activities such as searching, reviewing for responsiveness, and screening for privilege. *Race Tires*, 674 F.3d at 169-70; *see also Country Vintner*, 718 F.3d at 260 (adopting Fourth Circuit's reasoning in *Race Tires*). As between "making copies" and "attorney and paralegal review," *Race Tires*, 674 F.3d at 170, we think that the former better describes imaging a source drive and extracting requested data where the extracted data are included in the discovery request. It seems to us that there is no good reason, as a default matter, to distinguish copying one part of an electronic document (*i.e.*, the part that is visible when printed) from copying other parts (*i.e.*, parts not immediately visible) when both parts are requested. More precisely, we think that this is the better application of the principle that governs in the Eleventh Circuit, suitably adjusted for the 2008 amendment of section 1920(4). We emphasize, however, that a default rule can be altered by agreement of the parties.

D

CBT also contests the district court's award of $1887.00 in fees to Return Path for prior-art searches. Return Path does not meaningfully defend the award, and for good reason. The record does not in any way indicate that these fees were for copying of prior-art documents; the cost is identified simply as "Prior Art Searches." Nothing in Section 1920 covers research costs, and the Eleventh Circuit has confirmed that fees for computerized legal research, an analogous expense, are not recoverable. *Duckworth v. Whisenant*, 97 F.3d 1393, 1399 (11th Cir. 1996). Accordingly, we reverse the district court's award of fees for prior-art searches.

CONCLUSION

Because the district court erred in interpreting 28 U.S.C. § 1920, the district court's fee award is reversed in

part and vacated in part, and the case is remanded for the district court fully to apply the approach and conclusions of this opinion to the particular cost requests submitted in this case.

## REVERSED IN PART, VACATED IN PART, AND REMANDED

# United States Court of Appeals
# for the Federal Circuit

---

**CBT FLINT PARTNERS, LLC,**
*Plaintiff-Appellant,*

v.

**RETURN PATH, INC.,**
*Defendant-Appellee,*

AND

**CISCO IRONPORT SYSTEMS, LLC,**
*Defendant-Appellee.*

---

2013-1036

---

Appeal from the United States District Court for the Northern District of Georgia in No. 07-CV-1822, Judge Thomas W. Thrash, Jr.

---

O'MALLEY, *Circuit Judge,* concurring in part and dissenting in part.

I agree with much of the majority's thoughtful discussion of the scope of costs recoverable under 28 U.S.C. § 1920(4) and that the bulk of the costs awarded by the district court in this case are not recoverable thereunder. Clearly, the many and varied vendor services the majority categorizes as falling into "stage two" of its analysis cannot be characterized as "costs" under § 1920(4). Nor

can the charges for the prior-art searches conducted on behalf of Return Path. I agree, accordingly, that the judgment deeming those items recoverable as "costs" must be reversed. I do not believe the majority is sufficiently mindful of the limits imposed on courts by § 1920(4), however. I, thus, respectfully dissent from the portion of the majority opinion that authorizes, as "costs," an award of the pre-duplication expenses the majority describes as stage one costs.

While I appreciate the policy goals driving the majority's desire to shift the costs incurred under stage one to the party requesting discovery, I believe the majority improperly expands § 1920(4) to achieve those goals. And, I do not believe the Eleventh Circuit would follow the path the majority forges, because doing so both creates an unnecessary circuit split and is inconsistent with the narrow approach the Eleventh Circuit has to date taken with respect to § 1920(4). There are many vehicles to assure proper and fair cost shifting relating to electronic discovery, § 1920(4) is simply not one of them.

## I.

The majority correctly explains that, under Eleventh Circuit law, section 1920(4) "'allows recovery only for the reasonable costs of *actually duplicating documents, not for the cost of gathering those documents as a prelude to duplication.*'" Slip Op. 5-6 (emphasis added) (quoting *Allen v. U.S. Steel Corp.*, 665 F.2d 689, 697 n.5 (5th Cir. Unit B 1982)). The majority also acknowledges that "only the costs of creating the *produced duplicates* are included, not a number of preparatory or ancillary costs commonly incurred *leading up to, in conjunction with, or after duplication.*" Slip Op. 10 (emphasis added). And, it explains that the Supreme Court's most recent pronouncement on the scope of § 1920 included an admonition to read it narrowly. *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, 2006 (2012) ("Our decision is in keeping with the

narrow scope of taxable costs."). Despite faithfully reciting these general principles, the majority then seems to ignore them when it finds that the costs incurred during the initial imaging of source media and the extraction of metadata are steps involved in the duplication process, and not those leading up to duplication.[1] I disagree and believe that these steps instead fall, in the words of the Eleventh Circuit's own formulation, within the "prelude to duplication" and are not taxable costs. Both the Third and Fourth Circuits have reached the same conclusion. *See Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 674 F.3d 158, 169 (3d Cir. 2012), *cert. denied*, 133 S. Ct. 233 (2012) ("Section 1920(4) does not state that all steps that lead up to the production of copies of materials are taxable."); *Country Vintner of N.C., LLC v. E. & J. Gallo Winery, Inc.*, 718 F.3d 249, 260 (4th Cir. 2013) (finding the Third Circuit's reasoning persuasive to not include imaging or metadata extraction costs). Particularly in light of the Supreme Court's recent admonition in *Taniguchi*, I believe the Eleventh Circuit would as well, avoiding a circuit split and a ruling that essentially taxes the costs of making two duplicates, not only the single "produced duplicate."

Similar to the majority's comparison of stage two to the paper-document analogue, I analogize stage one to the traditional process of getting ready to produce paper documents in discovery. Generally, a complex paper production requires a party to locate potentially relevant paper documents, gather and collect those documents from various locations (including often creating copies of these original documents), perform a centralized review of

---

[1]  I do not question that the cost of imaging source media would fall under section 1920(4) if it were directly imaged and provided to the opposing party as part of discovery.

the gathered documents, determine which documents to produce, and ultimately, make copies of a smaller subset of relevant documents. The smaller subset is then produced to the other party. The expenses incurred in the activities that precede the step of making the final produced copies have not been considered taxable, however.

When comparing this process to an electronic document production, the initial imaging step is akin to "gathering and collecting" paper documents for production. While several steps are essential to the process, only making the final produced copies are covered under section 1920(4). As such, even if a party must process and extract metadata to make a production copy, those activities do not constitute "making copies" under section 1920(4). As noted above, other circuits agree.

The Third and Fourth Circuits have recently found that those expenditures incurred for the initial imaging step and extraction of metadata are not taxable as "costs" under § 1920(4). *See Race Tires*, 674 F.3d at 169 ("None of the steps that preceded the actual act of making copies in the pre-digital era would have been considered taxable."); *id.* ("Hard drives may need to be imaged . . . . But that does not mean that the services leading up to the actual production constitute 'making copies.'"); *Country Vintner*, 718 F.3d at 260-61 ("We find the Third Circuit's reasoning persuasive. . . . All of these considerations support the conclusion that, in this case, subsection (4) limits taxable costs to those identified by the district court: converting electronic files to non-editable formats, and burning the files onto discs."). And, since the Third Circuit's decision in *Race Tires*, the majority of district courts have agreed with the Third and Fourth Circuits. *See, e.g., Phillips v. WellPoint Inc.*, No. 3:10-CV-00357-JPG, 2013 WL 2147560, at *6 (S.D. Ill. May 16, 2013); *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, No. 1:10CV910 LMB/TRJ, 2013 WL 1192947, at *8 (E.D. Va. Mar. 21, 2013); *Eolas Techs. Inc. v. Adobe Sys., Inc.*, 891

F. Supp. 2d 803, 806 (E.D. Tex. 2012); *Plantronics, Inc. v. Aliph, Inc.*, No. C 09-01714 WHA LB, 2012 WL 6761576 (N.D. Cal. Oct. 23, 2012); *Cordance Corp. v. Amazon.com, Inc.*, 855 F. Supp. 2d 244, 250 (D. Del. 2012); *see also Mann v. Heckler & Koch Def., Inc.*, No. 1:08CV611 JCC, 2011 WL 1599580, at *9 (E.D. Va. Apr. 28, 2011) (denying metadata extraction as taxable before *Race Tires*); *Fast Memory Erase, LLC v. Spansion, Inc.*, No. 3-10-CV-0481-M-BD, 2010 WL 5093945, at *4-7 (N.D. Tex. Nov. 10, 2010), *report and recommendation adopted*, No. 3-10-CV-0481-M-BD, 2010 WL 5093944 (N.D. Tex. Dec. 13, 2010) *aff'd sub nom. Fast Memory Erase, LLC v. Intel Corp.*, 423 F. App'x 991 (Fed. Cir. 2011) (denying collecting and processing ESI costs before *Race Tires*).  Like all of these other courts, I do not believe § 1920(4) covers the cost of the initial imaging step or the extraction of metadata as it is a part of the "prelude to duplication" of the produced copy.

Section 1920(4) also only covers the costs of creating a single copy produced to the other party.  "[T]he prevailing party can recover, as costs for reproduction and exemplification under section 1920(4), the costs incurred *in preparing a single copy* of the original documents produced for the opposing party where *that copy* is supplied to the opposing party."  *In re Ricoh Co., Ltd. Patent Litig.*, 661 F.3d 1361, 1367 (Fed. Cir. 2011) (emphases added) (citation omitted).

The majority's decision to include as costs a pro-rated portion of expenses incurred in initially imaging a source media compared to the subset produced, however, accounts for more than the costs of producing a *single* copy to another party.  In reaching its conclusion that the costs of initial imaging are covered, the majority appears to confuse the costs for making a single copy produced to another party with those of making any copies of electronically produced documents in discovery, even those not produced.  Without question, an electronic document that

is first imaged, and then later produced, is copied twice: first, when the document is initially imaged as part of the original source media, and again, when another copy is made for production to the other party. The first copy, however, is often created for the producing party's own efficiency and convenience by allowing the party to upload the documents to a central database to process and review before creating a subset "copy" to produce to the opposing party. Indeed, that is precisely what Cisco and Return Path did here. By adopting a rule that includes the costs of the initial imaging under section 1920(4), the majority effectively allows a party to tax the costs of making two copies, even though the initial imaged copy is not produced. But that is not what the statute authorizes.[2]

The majority rewrites § 1920(4) to address the increasing cost of electronic discovery. That is not our role, however. *Harris v. Garner*, 216 F.3d 970, 976 (11th Cir. 2000) ("[T]he role of the judicial branch is to apply statutory language, not to rewrite it.") (citations omitted); *Korman v. HBC Fla., Inc.*, 182 F.3d 1291, 1296 (11th Cir. 1999) ("It is not the business of courts to rewrite statutes."). We are not authorized to stretch a statute to cover costs the Court believes should be covered in light of

---

[2]    The majority equates the initial imaging and extraction of metadata with the process of scanning documents so that electronic copies can be made, which the Third and Fourth Circuits do categorize as recoverable costs. Scanning is a necessary incident to the making of a final digital duplicate and, thus, is "the modern-day equivalent of '. . . copies of papers.'" *Race Tires*, 674 F.3d at 167 (quoting *Brown v. McGraw-Hill Cos.*, 526 F. Supp. 2d 950, 959 (N.D. Iowa 2007)). The fact that scanning falls within the narrow confines of the "incidental expenses" authorized under § 1920(4) does not open the door to all activities that pre-date that exercise, however.

changes in technology; only Congress can rewrite § 1920(4).[3] *See Race Tires*, 674 F.3d at 170 ("Nor may the courts invoke equitable concerns . . . to justify an award of costs for services that Congress has not made taxable.").

Indeed, Congress drafted § 1920(4) narrowly so that the back-end assessment of costs would be no more than a clerical exercise. *See Taniguchi*, 132 S. Ct. at 2006 ("[T]he assessment of costs most often is merely a clerical matter that can be done by the court clerk.") (quoting *Hairline Creations, Inc. v. Kefalas*, 664 F.2d 652, 656 (7th Cir. 1981)). The Supreme Court has made clear that taxable costs are "modest in scope" and "limited to relatively minor, incidental expenses." *Id.* They were meant to be so narrow and straightforward that the clerk of the court generally could handle their taxation, without resort to judicial officers. *See* 28 U.S.C. § 1920 ("A judge or *clerk* of any court of the United States may tax as costs . . . .") (emphasis added); *Taniguchi*, 132 S. Ct. at 2006 ("the assessment of costs most often is merely a clerical matter that can be done by the court clerk.") (quoting *Hairline Creations*, 664 F.2d at 656). Shirking this principle, the majority's ruling creates a complicated taxation process that requires judicial officers or the clerk of the court to determine: (1) if the parties came to any agreement

---

[3]    In *National Boiler Marketing Association v. United States*, the Supreme Court quoted Justice Harlan's proposition that a statute "is not an empty vessel into which this Court is free to pour a vintage that we think better suits present-day tastes." *Nat'l Broiler Mktg. Ass'n v. U. S.*, 436 U.S. 816 (1978) (quoting *United States v. Sisson*, 399 U.S. 267, 297 (1970)). The Court then noted that "[c]onsiderations of this kind are for the Congress, not the courts." *Id.*

regarding electronic discovery production,[4] (2) if that agreement included the exchange of metadata, (3) whether that metadata could have been "preserved without initial imaging and extraction techniques,"[5] (4) what constitutes a pro-rated amount of the initial imaged source media, and (5) how to pro-rate the initial imaging expenses to the subset produced. Congress did not envision that complicated calculations would be involved in the determination of costs under § 1920(4). But the majority requires precisely that on remand, in contravention of Congressional intent.[6]

Not only is it beyond our authority to rewrite § 1920(4), it is not even necessary to address the concern the majority pinpoints—the propriety of shifting costs to the requesting party when a Court rule or agreement between the parties requires production in a particular electronic format. Slip Op. 12-13. Myriad options exist for a party to shift the costs of such discovery without upending Congressional intent. Indeed, Appellees had

---

[4]    The parties concede there was no formal agreement in this case—either written or oral—to shift the costs of extracting metadata. Apparently, the majority would find a tacit agreement to shift such costs whenever a request for metadata occurs, and a producing party acquiesces to such a request.

[5]    This process can include a highly intensive case-by-case scenario that requires a determination of the type of metadata requested and the type of electronically stored information gathered in discovery.

[6]    The majority also does not provide clear guidance on remand for the district court to determine the extent to which costs are taxable when the producing party could have copied the requested documents directly from the source media, but chose to image source drives for its own efficiency.

these options available, but failed to take advantage of them early in the litigation. For example, the Northern District of Georgia Local Rules as well as Rule 26 of the Federal Rules of Civil Procedure provide avenues for early discussions among the parties regarding the scope of relevant discovery and how to allocate cost sharing.

Northern District of Georgia Local Rule 16.2 requires parties to submit a Joint Preliminary Report and Discovery Plan. N.D. Ga. Civ. R. 16.2. Local Rule 16.2 requires the parties to, among other things, discuss limitations on electronic discovery, sources, define the scope of discovery, and strike agreements regarding the format of and production of electronic documents. *Id.* App. B. As such, the parties should have discussed cost-shifting and burdensome discovery at that time, and could have reached agreements to either limit discovery or shift certain costs relating thereto. As we have noted, agreements to allocate costs are permissible and enforceable. *See In re Ricoh*, 661 F.3d at 1366-67.

Rule 26 of the Federal Rules of Civil Procedure also provides numerous possibilities to limit or manage the costs of discovery. Rule 26(b)(2)(B) limits discovery on electronically stored information from sources not "reasonably accessible," and provides the court discretion to order discovery and specify cost-shifting to obtain that discovery. Rule 26(b)(2)(C) also requires a court to limit the frequency or extent of discovery otherwise allowed if "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." Finally, Rule 26(c) allows a party from whom discovery is sought to move for a protective order limiting discovery or specifying discovery under certain terms.

Despite the district court's authority to limit discovery or shift costs in this case, virtually no discussion occurred in this case until later in discovery. Indeed, Cisco finally took advantage of some of these existing avenues for relief in a late request for fee shifting regarding a specific group of documents. In a June 11, 2008 Order, the district court found that Cisco had established that certain documents were not reasonably accessible because of undue burden or cost, and ordered Cisco "to produce those documents on the condition that [CBT] pay Cisco $300,000.00 as the cost of conducting a privilege review." JA149-50. CBT then chose not to pursue discovery of those documents. While Cisco argues that only a small window for discovery existed, it could have turned to the above-mentioned options and to the court when CBT made their initial requests, which Cisco characterized as asking for "in effect, every document in the company." Appellee Br. 3. Simply put, Cisco and Return Path could have and should have come to an agreement with CBT regarding the costs of discovery or asked for assistance from the court earlier. Having never sought to shift or avoid these costs sooner, they should not now be permitted to push a square peg into a round hole by attempting to squeeze their electronic discovery costs into section 1920(4), and the majority should not condone their effort to do so.

## II.

Accordingly, I respectfully dissent from the majority's conclusion to expand the narrow confines of costs taxable under Section 1920(4). In this case, only the costs of creating the final single copy produced to the requesting party are covered by § 1920(4), including scanning to the extent necessary, converting documents to a uniform production format, copying the converted files to production media, the creation and copying of load files, and the cost of the production media itself.